UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

EDDIE HOOVER, M.D.,

                          Plaintiff,

          v.

ROBERT WILKIE, Secretary of the Department
 of Veterans Affairs,
WILLIAM F. FEELEY, Director of Medical Center
  Veteran Affairs Western New York Healthcare
  Systems, and
MIGUEL RAINSTEIN, M.D., Chief of Staff
  Veteran Affairs Western New York Healthcare
  Systems,

                         Defendants.
_____

DECISION
and
ORDER

11-CV-734F

APPEARANCES:        LAW OFFICE OF ANTHONY L. PENDERGRASS
                      Attorneys for Plaintiff
                      ANTHONY L. PENDERGRASS, of Counsel
                      2528 Bailey Avenue
                      Suite 2
                      Buffalo, New York  14215

                      JAMES P. KENNEDY, JR.
                      UNITED STATES ATTORNEY
                      Attorney for Defendant
                      MICHAEL S. CERRONE, and
                      DANIEL BARRIE MOAR
                      Assistant United States Attorneys, of Counsel
                      Federal Centre
                      138 Delaware Avenue
                      Buffalo, New York  14202

## **JURISDICTION**

On December 14, 2018, the parties to this action consented pursuant to 28

U.S.C. § 636(c) to proceed before the undersigned.  The matter is presently before the

court for findings of fact and conclusions of law following a bench trial.

## BACKGROUND

On August 31, 2011, Plaintiff Eddie Hoover, M.D. ("Plaintiff"), commenced this action alleging employment discrimination in connection with Plaintiff's employment with the Department of Veterans Affairs ("VA"), at the Buffalo VA Medical Center ("VAMC"), in Buffalo, New York. Plaintiff asserted five claims for relief against three named defendants including Robert Wilkie ("Wilkie"), then Secretary of the Department of Veterans Affairs ("the VA"), William F. Feeley, Director of Medical Center Veteran Affairs Western New York Healthcare Systems ("Director Feeley" or "Feeley"), and Miguel Rainstein, M.D., Chief of Staff ("COS") Veteran Affairs Western New York Healthcare Systems ("Dr. Rainstein") (together, "Defendants"). Plaintiff alleged against the VA, Director Feeley, and Dr. Rainstein claims for race-based discrimination and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), ("First Claim"), Title VII retaliation ("Second Claim"), discrimination, hostile work environment, and retaliation under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") ("Third Claim"), discrimination, hostile work environment, and retaliation under the Rehabilitation Act, 29 U.S.C. § 791 *et seq.* ("Rehabilitation Act") ("Fourth Claim"), and due process violations pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) ("*Bivens*") ("Fifth Claim"). In an Order filed October 16, 2012 (Dkt. 12), District Judge Richard J. Arcara adopted the undersigned's Report and Recommendation filed September 27, 2012 (Dkt. 11), granting Defendants' motion (Dkt. 5) seeking dismissal of several of the claims including the Title VII, ADEA and Rehabilitation Act claims as against Director Feeley and Dr. Rainstein, as well as the *Bivens* due process claim as against the VA. In an

Order filed May 4, 2015 (Dkt. 45), Judge Arcara adopted the undersigned's Report and Recommendation filed March 30, 2015 (Dkt. 44), granting in part and denying in part Defendants' motion for summary judgment (Dkt. 27), thereby dismissing as against Director Feeley and Dr. Rainstein Plaintiff's Title VII race discrimination claim, ADEA age discrimination claim, Rehabilitation Act failure to accommodate claim, ADEA and Rehab Act retaliation claims, Title VII and Rehabilitation Act hostile work environment claims, and the *Bivens* due process claims. Left for trial were the Title VII retaliation claim, the ADEA hostile work environment claim, and the ADEA constructive discharge claim against the VA, the only remaining Defendant. The undersigned presided over a bench trial[1] held June 10 to June 18, 2019, at which testimony was provided by Plaintiff, Dr. Rainstein, Dr. Nader Nader ("Dr. Nader"), Kathryn Varkonda ("Varkonda"), and Theodora Gearhart ("Gearhart"). Entered into evidence were Defendant's Exhibits 1-43, 55 (Bates Nos. 9-35; 112-114, 139-40), 57 (Bates Nos. 113-23, 327-330, 337-39), 58 (Bates Nos. 365, 366-69, 441, 463-65, 488, 714-15, 723-24, 753-54), 59 (Bates Nos. 1814-1817), and 60 (Bates Nos. 1916, 1958, 1962, 1998, 2019, 2027-56, and 3072). Following the close of evidence, the undersigned reserved decision, ordered a trial transcript, and ordered the parties to submit proposed findings of fact and conclusions of law. Accordingly, on October 28, 2019, Defendant filed Defendant's Proposed Findings of Fact and Conclusions of Law (Dkt. 96). Despite several extensions of the deadline for Plaintiff to file post-trial submissions (Dkts. 94 (setting September 30, 2019 as deadline), and 95 (setting October 31, 2019 as deadline)), to date, Plaintiff has not

---

[1] Although Title VII claims asserted against the federal government may proceed by jury trial, while ADEA claims against the federal government may not, by letter dated June 5, 2019 (Dkt. 78), Plaintiff advised of his election to proceed before the undersigned in a nonjury trial on all remaining claims, thereby waiving his right to a jury on the Title VII claims.

filed any.  Based on the following, Plaintiff has established no cause of action against Defendant VA as alleged in the Complaint which is DISMISSED with prejudice.

## **FINDINGS OF FACT**[2]

Plaintiff Eddie Hoover, M.D. ("Plaintiff" or "Dr. Hoover"), commenced employment with the VA as Chief of Surgery at the Brooklyn VA Medical Center in 1980.  Dkt. 88 at 55-57.  In 1990, Plaintiff accepted a position with the State University of New York at Buffalo School of Medicine ("Medical School"), as Chairperson of the Surgery Department, which position included responsibilities at the Buffalo VA Medical Center ("Buffalo VA"), including general thoracic surgeries involving lungs, esophagus, pacemakers, and general surgery, although Plaintiff had by then ceased performing cardiac surgeries.  *Id.* at 60-61.  In 1996, Plaintiff, through the Medical School's appointment power, appointed himself Acting Chief of Surgery at the Buffalo VA.  *Id.* at 79-82; Dkt. 89 at 148-49.  In 2001, Plaintiff was released from his Medical School Chairperson of Surgery position.  Dkt. 89 at 162-63.

On July 1, 2005, Dr. Rainstein joined the Buffalo VA as Chief of Surgery, replacing Plaintiff in that position.[3]  Dkt. 88 at 83; Dkt. 92 at 27.  To make way for Dr. Rainstein, on June 26, 2005, Plaintiff was transferred to the position of Associate Chief of Staff ("ACOS") for Patient Safety at Buffalo VA.  Defendant's Exhs. 3 and 4; Dkt. 88 at 83, 86-87; Dkt. 89 at 148-49; Dkt. 91 at 6.  In the new position Plaintiff briefly

---

[2] Taken from the trial transcript filed in six volumes on August 5, 2019 (Dkts. 88-93), respectively, containing the transcripts for the proceedings on June 10, 11, 12, 13, 17, and 18, 2019, and Defendant's Exhibits entered into evidence.  References to the transcripts are to the pages of the transcript identified by the applicable docket number, and references to Defendant's Exhibits are to the specific Bates numbered pages where necessary.

[3] In December 2008, Dr. Rainstein became Chief of Staff at the Buffalo VA.  Dkt. 91 at 43.

continued to perform surgeries until May 17, 2006, when he commenced working full-time as ACOS for Patient Safety, an administrative position, and his privileges for surgery and patient treatment were removed at the Buffalo VA. Dkt. 88 at 83, 87, 89; Dkt. 89 at 149; Dkt. 93 at 33. Despite no longer performing surgeries or treating patients, Plaintiff's pay as ACOS for Patient Safety remained the same as when Plaintiff was Chief of Surgery. Dkt. 88 at 85. Plaintiff's privileges were instituted for internal medicine from May 6, 2010 to October 14, 2010, when Plaintiff was assigned to the Buffalo VA's Compensation and Pension Department ("C&P Department" or "Comp and Pen"), where Plaintiff conducted compensation and pension examinations ("C&P exams").[4] Dkt. 93 at 33-34. Plaintiff remained assigned to the C&P Department until his retirement on October 14, 2010. Dkt. 89 at 76; Dkt. 93 at 33-34.

Throughout his tenure at the Buffalo VA, Plaintiff received base pay or salary,[5] and was also eligible for "Performance Pay" which is akin to a bonus and earned upon meeting performance objectives established for each year. Dkt. 89 at 162. Plaintiff was also subject to periodic job performance reviews at which it was determined whether Plaintiff met the relevant performance objectives and the amount of Performance Pay earned. Dkt. 89 at 158-62. Plaintiff's job performance reviews routinely were more than satisfactory with Plaintiff earning the maximum amount of Performance Pay available until September 30, 2006, the end of Plaintiff's first full fiscal year as ACOS for Patient Safety, with Plaintiff receiving no ratings exceeding the "fully successful" ratings benchmark, and of the possible Performance Pay of $ 5,000, earned only $ 1,000.

_____

[4] According to Dr. Hoover, the purpose of a C&P exam is to determine whether a veteran has a military service-related injury resulting in a disability and, if so, the extent of such disability. Dkt. 90 at 11-12.
[5] Plaintiff's salary is actually comprised of base or "market" pay, plus a locality adjustment.

Defendant's Exhs. 5-6; Dkt. 89 at 154-55. On Plaintiff's next job performance review for the fiscal year ending September 30, 2007, of the possible $ 14,000 Performance Pay, Plaintiff received $ 5,500, with Plaintiff fully meeting one of two performance goals, but only partly meeting the other. Defendant's Exh. 7. Plaintiff does not dispute consistently failing in subsequent years to achieve performance review ratings higher than satisfactory. Dkt. 89 at 155-61.

In the position of ACOS for Patient Safety, Plaintiff was responsible for following VA directives from the central VA office. Dkt. 91 at 8-9. Although Patient Safety was part of the clinical area for which Dr. Rainstein was responsible, Plaintiff did not then directly report to Dr. Rainstein. *Id.* at 9-12. Both Plaintiff and Dr. Rainstein were required to attend Patient Safety, and VA Ethics committee meetings, but Plaintiff often did not attend or would fall asleep at the meetings. Dkt. 92 at 41-43. Upon assuming the ACOS for Patient Safety position, Plaintiff was to lead or "chair" root cause analyses ("RCA") investigations which are non-punitive investigations intended to improve quality of the VA system. Dkt. 91 at 93; Dkt. 93 at 54. Plaintiff, however, participated in only eight of the 63 RCA investigations occurring during Plaintiff's tenure as ACOS for Patient Safety, none of which Plaintiff chaired. Dkt. 93 at 54-54.

As ACOS for Patient Safety, Plaintiff's office was located in the VA's Performance Management Department which, at all times relevant to this action, was headed by Kathryn Varkonda ("Varkonda"), Performance Manager, who observed Plaintiff on a daily basis. Dkt. 88 at 144; Dkt. 93 at 22. Although Plaintiff was scheduled to work from 8:00 A.M. to 4:30 P.M. each day, Plaintiff usually arrived at work at 10:00 A.M., spent his mornings drinking coffee and reading newspapers and magazines until

11:00 A.M. when Plaintiff typically took a nap, and left work at 1:30 P.M. Dkt. 91 at 29-30; Dkt. 93 at 38-41. While napping, Plaintiff sometimes slept in his chair, but at other times, Plaintiff would crawl under his desk and sleep in a fetal position. Dkt. 93 at 42, 89. When he slept, Plaintiff snored loud enough that several nurses in surrounding offices could hear. *Id.* at 42-43.

As of June 4, 2009, one David West ("West"), was the Buffalo VA's Acting Medical Center Director, Dkt. 88 at 92-94, and Defendant Feeley was Deputy Undersecretary for the VA, located in Washington, D.C., but was scheduled to join the Buffalo VA as Medical Center Director, Dkt. 89 at 164, and did so on June 21, 2009. Dkt. 93 at 31. In a letter to Feeley dated June 4, 2009 ("June 4, 2009 Letter"), Plaintiff, then ACOS for Patient Safety, alleged several African-American physicians at the Buffalo VA, including Plaintiff's then-wife Dr. Gwendolyn Cole-Hoover ("Dr. Cole-Hoover"), and Dr. Mark Awolesi ("Dr. Awolesi"), had been subjected to race-based discrimination in connection with their employment at the Buffalo VA. Defendant's Exh. 10. In his June 4, 2009 Letter, Plaintiff explained he was writing to Feeley rather than to West because the issues of which Plaintiff was complaining might need to be addressed before Feeley's arrival and "were a direct consequence of Mr. D. West's management style, and people were just trying to get/stay on his good side, because it looked like he might become our permanent M[edical]C[enter]D[irector]." *Id.* at 1. According to Plaintiff, when Dr. Cole-Hoover complained to her supervisors about harassment by a co-worker, she was wrongly accused of falsifying and inadequately charting patients. *Id.* Plaintiff further maintained Dr. Awolesi was wrongly accused of patient abuse, attributing the falsehood to one Dr. Carlos Li ("Dr. Li"), who Plaintiff asserted was

directly responsible for causing the deaths of three patients ("mortality cases"), for which

Dr. Li was never disciplined.  *Id.* at 2-3.  Plaintiff testified his knowledge regarding the

three mortality cases came from other VA employees, "personnel in the operating room

and intensive care unit," whose names he could not remember but who reported their

concerns more than two years after the deaths, Dkt. 88 at 115-16, yet Plaintiff did not

review at least two of the deceased patients' charts until after sending the June 4, 2009

Letter to Feeley, *id.* at 118-19, 137; Dkt. 89 at 167-68, which failure Plaintiff

characterized as an "oversight," Dkt. 88 at 139, of which Dr. Rainstein was not then

aware.  Dkt. 92 at 36, 71-72.  Also, as of June 4, 2009, Plaintiff was aware at least one

of the three mortality cases had been subjected to independent expert review ("outside

review"), at the VA cardiac surgery cooperative located at the University of Colorado in

Denver, where further investigations were conducted of mortalities that were

accompanied by specific concerns.  Dkt. 88 at 102-04, 140.  Within one week of

sending the June 4, 2009 Letter,[6] Feeley responded by e-mail to Plaintiff, West, and Dr.

Rainstein (Defendant's Exh. 11) ("Feeley's Response"), advising Dr. Rainstein would

contact Plaintiff regarding the specifics of the mortality cases and that Feeley would

further review the matter upon his impending arrival at the Buffalo VA.  By e-mail dated

June 9, 2009 (Defendant's Exh. 12) ("June 9, 2009 e-mail"), Feeley forwarded Plaintiff's

June 4, 2009 Letter to West, Dr. Rainstein, Stephen L. Lemons, Ph.D. ("Dr. Lemons"),

---

[6] Although Feeley's e-mailed response is undated, Plaintiff conceded at trial it was received within one week of the June 4, 2009 Letter.  Dkt. 89 at 176.

and Dr. Lawrence Flesh ("Dr. Flesh"),[7] asserting the quality of care concerns raised in the letter needed outside review by physician expertise.

On the morning of June 15, 2009, Dr. Rainstein met with Plaintiff with Varkonda also present to discuss the three mortality cases. Defendant's Exh. 13; Dkt. 89 at 174-77; Dkt. 92 at 37-40. Dr. Rainstein requested Plaintiff provide certain identifying information for each of the three mortality cases, including the last names and the last four digits of the social security number for each of the three deceased patients ("identifying information"), stressing such identifying information was required for Dr. Rainstein to forward the relevant medical records to Dr. Frederick Grover who was in charge of the outside review. *Id.* Dr. Rainstein also advised that every mortality case since 2007 involving Dr. Li had already been reviewed at the Buffalo VA's Morbidity and Mortality committee's meeting, a PEER Review committee meeting, and an outside review, and also investigated by the VA's Inspector General ("IG"), *id.*; Plaintiff was not involved in any of these previous reviews. Dkt. 88 at 114-15. Despite being subjected to four levels of review, no concerns were noted on any of Dr. Li's mortality cases but, based on the concerns Plaintiff raised in the June 4, 2009 Letter, Dr. Rainstein needed the three mortality cases identified for further review by Frederick Grover, M.D. ("Dr. Grover"), an outside review cardiothoracic surgeon. Defendant's Exh. 13; Dkt. 89 at 174-77; Dkt. 92 at 37-40. Dr. Rainstein again stressed the need for the identifying information in a follow-up e-mail to Plaintiff on June 15, 2009, Defendant's Exh. 13 ("June 15, 2009 e-mail"), memorializing the morning's meeting with Plaintiff. Plaintiff

---

[7] Dr. Rainstein explained that Dr. Lemons was the head and Dr. Flesh was the chief medical officer of Region 2 of the Veterans Integrated Service Networks ("VISN") ("VISN 2"), which refers to the geographical regions into which veterans' health care is separated in the United States. Dkt. 92 at 34-35.

admits attending the June 15, 2009 meeting at which Dr. Rainstein requested the identifying information, and receiving the June 15, 2009 e-mail, Dkt. 89 at 177-79, and concedes he understood Dr. Rainstein requested only the identifying information for the mortality cases to permit Dr. Grover to review them, and did not intend for Plaintiff to perform a "local" review, Dkt. 88 at 103; Dkt. 89 at 185, yet Plaintiff did not immediately provide the requested identifying information nor request additional time to respond. Dkt. 89 at 179-80, 186. Plaintiff maintains he intended to perform an "internal review" of the mortality cases despite none being requested by Dr. Rainstein, but such review was delayed by Plaintiff's work-load which then involved conducting orientation and scheduling summer medical residents and interns. Dkt. 88 at 106, 112. On June 17, 2009, with the identifying information for the three mortality cases still not received, Dr. Rainstein again e-mailed Plaintiff, requesting the identifying information by close of business on June 18, 2009, stressing his concern that the matter needed to be investigated by Dr. Grover, Defendant's Exh. 14; Dkt. 88 at 117-18; Dkt. 89 at 177, but Plaintiff maintains his work-load continued to prevent Plaintiff from providing the information at that time. Dkt. 88 at 118-20.

In a Memorandum to Plaintiff dated June 23, 2009, Defendant's Exh. 15 ("June 23, 2009 Memo"), and copied to Director Feeley who assumed his position as Buffalo VA Director on June 21, 2009, Dkt. 92 at 46; Dkt. 93 at 31, Dr. Rainstein again reiterated the critical need for the identifying information, requesting Plaintiff provide it by 3:00 P.M. on June 24, 2009, and directed Plaintiff to contact Dr. Rainstein at his telephone extension if he had any questions. Dkt. 89 at 187-89. Despite admitting receiving the June 23, 2009 Memo when it was sent on June 23, 2009, Dkt. 89 at 179,

Plaintiff again failed to provide the requested identifying information by the specified deadline, nor did Plaintiff contact Dr. Rainstein, by telephone or otherwise, to advise he was unable to timely provide such information or to ask for additional time.  Dkt. 89 at 179-80, 189-90.  In a June 24, 2009 e-mail to Dr. Rainstein, Defendant's Exh. 16 ("June 24, 2009 e-mail"), Plaintiff did not provide the requested identifying information; rather, Plaintiff asserted he had been "tied up" with an RCA and orientation for incoming residents, and complained about Dr. Rainstein's correspondence requesting the information which correspondence Plaintiff referred to as "nasty" in its tone, adding his "full report" of the mortality cases "will require some time."  Dr. Rainstein replied by e-mail that he did not intend that his June 23, 2009 Memo to be perceived as "nasty," asserting he was not seeking a full report on the mortality cases but expected the identifying information by 3:00 P.M. that day.  Although Plaintiff concedes he understood a full report of the mortality cases was not requested by Dr. Rainstein, Plaintiff again failed to timely provide the requested identifying information to Dr. Rainstein.  Dkt. 89 at 191-94.  Based on Plaintiff's continued failure to provide the identifying information as Dr. Rainstein repeatedly directed, on June 29, 2009, Dr. Rainstein proposed admonishing Plaintiff for failure to comply with a direct order.  Defendant's Exh. 17 ("proposed admonishment"); Dkt. 89 at 194-95; Dkt. 92 at 58-61.  On July 2, 2009, Plaintiff delivered the requested identifying information to Varkonda who forwarded the material to Dr. Rainstein, who memorialized its receipt in an e-mail to Plaintiff. Defendant's Exh. 18; Dkt. 92 at 68.  On July 6, 2009, in an unsolicited e-mail to Dr. Rainstein, Defendant's Exh. 19 ("July 6, 2009 e-mail"), Plaintiff advised that upon his own further review of the mortality cases, Plaintiff did not see any need to forward the

cases to Dr. Grover but deferred to Dr. Rainstein's judgment on the matter. By letter

dated July 7, 2009 ("Letter of Admonishment"), Director Feeley approved Dr. Rainstein's

proposed admonishment of Plaintiff, advising the Letter of Admonishment would be

placed in Plaintiff's personnel folder for up to two years and could be used in

determining an appropriate penalty in the event Plaintiff was involved in further

infractions. Defendant's Exh. 20; Dkt. 91 at 80; Dkt. 92 at 61. Plaintiff never exercised

his right to administratively grieve the admonishment. Dkt. 89 at 195; Dkt. 92 at 62.

When Dr. Grover eventually reviewed the three mortality cases, no issue of concern

was found in any of the three cases. Dkt. 92 at 72.

On July 19, 2009, after replacing West, Director Feeley made some changes to

the lines of reporting, including having Plaintiff directly report to Dr. Rainstein. Dkt. 91 at

48-55. Out of concern that veterans were not timely receiving their benefits, in

September 2009, the VA General Shinseki issued a directive that C&P exams be

completed within 30 days. Dkt. 91 at 14-17. At that time, C&P exams at the Buffalo VA

took several physicians assigned to the C&P Department an average of 44 days to

complete, and Dr. Feeley approached Dr. Rainstein about the back-log. Dkt. 91 at 14-

18. Dr. Rainstein concurred with Varkonda's complaint that Plaintiff, as ACOS for

Patient Safety, produced little meaningful work product, and had a poor work ethic. Dkt.

91 at 26-30; Dkt. 92 at 83. According to Dr. Rainstein, based on Plaintiff's limited work

production and failure to regularly attend patient safety meetings Dr. Rainstein believed

Plaintiff was not needed in patient safety where two nurses handled most of the work.

*Id.* at 17-18. In September 2009, Plaintiff was initially assigned to assist the other C&P

Department physicians with performing C&P exams two days per week to help reduce the back-log.[8] Dkt. 91 at 19-20, 112, 117.

The part-time assignment to C&P exams did not result in any salary reduction to Plaintiff, Dkt. 91 at 17, and Dr. Rainstein testified Plaintiff was selected because the Patient Safety Department responsibilities were sufficiently handled by Varkonda and two nurses, including Robin Jordan ("Jordan"), and Patricia Pasieka ("Pasieka"), *id.* at 21-22, and Dr. Rainstein understood based on reports by Varkonda that Plaintiff was not performing his duties as ACOS in Patient Safety, *id.* at 28-30, although Dr. Rainstein admitted Plaintiff's job performance reviews from the relevant period of time indicate only that Plaintiff's job performance was fully satisfactory with no accompanying narrative indicating any deficiencies in Plaintiff's job performance. *Id.* at 42-45. Plaintiff continued to split his time between performing C&P exams in the C&P Department and his ACOS position in the Patient Safety Department. *Id.* at 45-46.

Plaintiff protested performing C&P exams, considered by Plaintiff "a clerical function" for which Plaintiff, based on his skills set, was overqualified. Dkt. 88 at 148-49. Plaintiff further maintains that at other VA facilities, C&P exams are performed by retired physicians working on a contract basis two to three days per week. *Id.* at 153-54. While Plaintiff was assigned to C&P exams two days per week, Plaintiff often applied to take personal leave on the days he was scheduled to perform C&P exams, instructing the C&P Department secretaries to cancel the scheduled C&P exams, only

---

[8] Dr. Rainstein could not remember whether Plaintiff was initially assigned to perform C&P exams in September 2009 or December 2009. *See* Dkt. 91 at 17 (Dr. Rainstein testifying Plaintiff may have been assigned to perform C&P exams in December 2009). Plaintiff recalls commencing C&P exams in August 2009. Dkt. 88 at 154.

to then cancel his personal leave and report to work as ACOS for Patient Safety on such days, but performing no work.  Dkt. 92 at 86.

By letter to Dr. Rainstein dated December 24, 2009 (Defendant's Exh. 23) ("December 24, 2009 Letter"), Plaintiff requested he be relieved of performing C&P exams and return full-time to his Patient Safety duties.  Dkt. 90 at 13.  By e-mail to Plaintiff dated December 28, 2009 (Defendant's Exh. 24) ("December 28, 2009 e-mail"), Dr. Rainstein denied the request, advising one Arleen Haas ("Haas"), in the C&P Department would continue to assign Plaintiff to perform C&P exams two days per week, Dkt. 90 at 13, which decision denying Plaintiff's request to return full-time to Patient Safety Plaintiff then appealed by letter to Director Feeley dated December 30, 2009 (Defendant's Exh. 25) ("December 30, 2009 Letter").  Dkt. 90 at 13-14.  According to Plaintiff, unlike other patients in the Buffalo VA, the C&P exam patients were not sick, and Plaintiff believed his responsibilities as ACOS for Patient Safety, which did not include direct patient contact and treatment but preserving health quality, were more important to the Buffalo VA.  *Id.* at 14-15.  In a January 4, 2010 Memorandum to Plaintiff (Defendant's Exh. 26) ("January 4, 2010 Memo"), Director Feeley concurred with Dr. Rainstein's decision assigning Plaintiff to perform C&P exams at a minimum of two days per week.  Dkt. 90 at 15-16.

Plaintiff, as a VA employee, was occasionally granted an authorized absence to attend medical conferences proved beneficial for improving patient care.  Dkt. 92 at 101-02.  Such authorized absence, which does not require the use of the physician's personal leave time, must be approved by the physician's supervisor.  *Id.* at 102.  If a physician's request for authorized absence is denied, the physician may still attend the

medical conference, but must use personal leave time to do so.  Dkt. 90 at 31-32; Dkt. 92 at 107-08.  A print-out of the VA's record of Plaintiff's leave requests for authorized absences to attend various medical association conferences and meetings for the period January 20, 2009 through January 25, 2010 ("Plaintiff's VA leave record"),[9] during which Dr. Rainstein was Plaintiff's supervisor and charged with approving or disapproving submitted leave requests, Dkt. 92 at 103-07, shows Plaintiff's requests for authorized absences were approved for April 2-3, 2009 (Society of Black Academic Surgeons meeting in Seattle, Washington); July 27-29, 2009 (National Medical Association meeting in Las Vegas, Nevada); October 12-15, 2009 (American College of Surgeons meeting in Chicago, Illinois), and January 25, 2010 (Society of Thoracic Surgeons in Fort Lauderdale, Florida), while two such requests were denied including for Jan. 26-27, 2009 (Society of Thoracic Surgeons in San Francisco, California), and May 1, 2009 (delivery of graduation speech at Prairie View University in Houston, Texas).  Plaintiff's VA leave record further establishes that throughout the same period, Plaintiff's various requests for annual leave (totaling 22 days), as well as for sick leave (totaling 9 days) were approved, while no such requests were denied.  In contrast, Plaintiff testified at the trial that during this same period of time, he was denied authorized leave to attend four meetings.  Dkt. 89 at 103-04.  During cross-examination at trial, Dr. Rainstein explained that although his practice had been to approve most requests for authorized leave to attend medical conferences, he was advised by the VA's Human Resources department that such leave should only be approved if attendance at such conferences is expected to benefit patient care in the VA.  Dkt. 92 at

---

[9] Defendant's Exh. 31.

107. Because many of Plaintiff's requests pertained to surgical conferences, and Plaintiff's last surgery was performed in September 2005, approval for Plaintiff's requests to attend surgical conferences were no longer routine, although Plaintiff still was permitted to use annual leave to attend such conferences. *Id.* at 107-08.

Plaintiff concedes that according to the VA's written policy, leave-granting authority is held by supervisors. Dkt. 90 at 37-38, 46-47. Nevertheless, on Tuesday, January 19, 2010, Plaintiff, then assigned part-time to the C&P Department where Dr. Rainstein was his supervisor, e-mailed several C&P Department employees including Dr. Rainstein's secretary Norma Hoffman ("Hoffman"), Theodora Gearhart ("Gearhart"), and Arlene Haas ("Haas"), as well as Patient Safety employees Jordan and Pasieka, advising "I am experiencing a family medical emergency situation and may be out the remainder of the week." Defendant's Exh. 29 ("January 19, 2010 e-mail"); Dkt. 90 at 46. Plaintiff continued that he would "keep you posted as soon as I gain new information," but that his "C&P clinics will need to be canceled for Jan. 21 & 22." January 19, 2010 e-mail; Dkt. 90 at 46. Plaintiff maintains he did not send the January 19, 2010 e-mail to his supervisor, Dr. Rainstein, because despite the VA's written policy, Dr. Rainstein "was always running around in the hospital and being busy. . . ," whereas Hoffman was always at her desk and more likely to see Plaintiff's e-mail and bring it to Dr. Rainstein's attention. Dkt. 90 at 46-47. As it happened, Dr. Rainstein was on vacation the week of January 18, 2010, and in his absence had appointed Dr. Nader Nader ("Dr. Nader"), as Acting Chief of Staff who then had leave granting authority with regard to Dr. Hoover in Dr. Rainstein's absence. Dkt. 91 at 178-79; Dkt. 92 at 89-90. In accordance with his usual practice, Dr. Rainstein notified by e-mail all staff, including Dr. Hoover, that he, Dr.

Rainstein, would be out the week of January 18, 2010, and that in Dr. Rainstein's absence, Dr. Nader would serve as Acting Chief of Staff. Dkt. 91 at 178-79; Dkt. 92 at 90-91. As such, Plaintiff was aware that Dr. Rainstein was scheduled to be out the week of January 18, 2010, during which Dr. Nader would serve as Acting Chief of Staff and, thus, as Plaintiff's supervisor with leave granting authority. Dkt. 92 at 90-91; Dkt. 93 at 6, 8. Throughout the remainder of the week of January 18, 2010, Plaintiff did not again e-mail or contact anyone at the Buffalo VA to advise of the reason for his absence, to request permission for his continued absence, nor to advise for how long Plaintiff anticipated being absent from work at the VA. Dkt. 90 at 54-56; Dkt. 93 at 10; Defendant's Exh. 30A. On January 20, 2010, while Plaintiff remained absent from work, Dr. Nader attempted to contact Plaintiff by paging him and calling Plaintiff at his home telephone number, but Plaintiff did not respond to any of the calls. Dkt. 93 at 9-11.

Upon returning to work on January 25, 2010, Dr. Rainstein resumed his position as Plaintiff's supervisor with leave-granting authority, although Plaintiff remained absent and did not provide any notice of his absence nor seek approval for his leave. Dkt. 92 at 92-95. Plaintiff remained absent without leave ("AWOL") though January 27, 2010, *id.* at 95-97, although on January 27, 2010, Dr. Rainstein managed to make contact with Plaintiff via cell phone around 2:00 P.M. *Id.* at 95-96. At that time, Plaintiff informed Dr. Rainstein that Plaintiff was leaving a doctor's appointment and would try to be in to work at the VA later that afternoon, to which Dr. Rainstein responded that it was already 2:00 P.M., and requested Plaintiff to report the next morning directly to Dr. Rainstein's office. *Id.* at 95. Dr. Hoover complied and met with Dr. Rainstein the morning of January 28, 2010, and the two discussed Plaintiff's recent absences. *Id.* at 96-97; Defendant's Exh.

33.  Dr. Rainstein memorialized the meeting in a Report of Contact ("January 28, 2010 Report of Contract"),[10] noting that other than the January 19, 2010 e-mail to Hoffman advising he may be out the rest of the week because of a family emergency, Plaintiff never contacted Drs. Rainstein or Nader regarding the absences as required, nor did Plaintiff ever notify anyone, including Hoffman, that his absence would extend into January 20, 21, 22, 26, and 27, 2010.  *Id.*  Plaintiff had been authorized for personal leave to attend, and did attend, a Society of Thoracic Surgeons' meeting in Florida on January 25, 2010.  *Id.*  Although Plaintiff maintained he sent further e-mails to Hoffman regarding the additional days of absence, neither Hoffman, Dr. Rainstein, nor Dr. Nader, received any further communication from Plaintiff regarding the absences.  Dkt. 92 at 97-98.  Dr. Rainstein inquired whether Plaintiff would be absent February 1 through February 4, 2010, as Plaintiff was scheduled to take personal leave those days, and Plaintiff indicated he intended to cancel such leave that had already been approved. January 28, 2010 Report of Contact; Dkt. 92 at 97-98.  Dr. Rainstein then advised that if Plaintiff submitted documentation establishing his whereabouts for January 19, 20, 21, 22, 26, and 27, 2010, ("AWOL days"), Dr. Rainstein would reclassify the leave from AWOL to sick leave.  January 28, 2010 Report of Contact; Dkt. 92 at 98-99.  Dr. Rainstein further advised Plaintiff's unscheduled absences required canceling many C&P exams, and that beginning February 8, 2010, Plaintiff was to perform C&P exams from 8:00 A.M. to noon every day at the VA.  January 28, 2010 Report of Contact. According to Dr. Rainstein, Plaintiff responded by accusing Dr. Rainstein of singling out Plaintiff when other physicians were available to perform the C&P exams, to which Dr.

---

[10] Defendant's Exh. 33.

Rainstein replied he was not singling out Plaintiff but that other physicians were fully occupied performing surgeries, the number of which had increased since Plaintiff worked as a surgeon, as well as colonoscopies, and that Plaintiff's services were not needed in Patient Safety but were needed in Comp and Pen.  January 28, 2010 Report of Contact.  Plaintiff replied that he could make more money by retiring and contracting to perform the C&P exams, adding Plaintiff thought Dr. Rainstein was attempting to force Plaintiff into retiring before September 2010 when Plaintiff became eligible for Medicare and Social Security benefits.  *Id.*  Dr. Rainstein denied any such motivation, adding he did not want to take any action that would interfere with Plaintiff's receipt of such benefits, but that the C&P exams needed to be performed, and that Plaintiff's failure to provide proper notice regarding the AWOL and resulting cancelation of the C&P exams would lead to disciplinary action.  *Id.*  When Plaintiff stated such action was an embarrassment at the end of his career, Dr. Rainstein asserted it was more embarrassing to have to tell Plaintiff to perform the C&P exams, as well as to instruct Plaintiff on the appropriate use of leave.  *Id.*  Dr. Rainstein concluded the meeting by advising Plaintiff a letter and disciplinary measure would be forthcoming.  *Id.*

Despite Dr. Rainstein providing Plaintiff with the opportunity to have the AWOL days considered as sick leave AWOL, Plaintiff never provided any documentation establishing any legitimate reason for being AWOL, nor was any such evidence produced at trial.  Dkt. 90 at 59, 65-66; Dkt. 92 at 99.  On January 28, 2010, after the conclusion of Dr. Rainstein's meeting with Plaintiff, Dr. Rainstein initiated the disciplinary process for Plaintiff's AWOL days.  Dkt. 92 at 100.

In a memorandum dated January 29, 2010 ("January 29, 2010 Memorandum"),[11] Dr. Rainstein advised Plaintiff that on February 8, 2010, Plaintiff would commence performing C&P exams 20 hours a week, *i.e.*, Monday through Friday, from 8:00 A.M. to noon. January 29, 2010 Memorandum at 2, ¶ 4. Plaintiff's signature, accompanied by a statement that Plaintiff signed under duress, indicates his receipt of the January 29, 2010 Memorandum on February 1, 2010. *Id.* at 2. On January 29, 2010, Plaintiff contacted the Buffalo VA's Office of Resolution Management ("ORM") for Equal Employment Office ("EEO") counseling, indicating his intent to file a discrimination claim against the VA. March 4, 2010 ORM Notice[12] at 337; Dkt. 90 at 74. Nothing in the record indicates Director Feeley or Dr. Rainstein was notified at that time that Plaintiff had contacted the ORM for EEO counseling. On February 1, 2010, Dr. Rainstein conducted a Performance Pay Recommendation & Approval for the period October 1, 2008 through September 30, 2009, for which Plaintiff was eligible for a maximum of $ 15,000 in performance pay, but Dr. Rainstein recommended Plaintiff be awarded no performance pay for that period. Defendant's Exh. 36.

By letter dated February 4, 2010 ("Proposed Termination Letter"),[13] Dr. Rainstein notified Plaintiff of the proposed termination of Plaintiff's employment based on (1) Plaintiff's failure to follow appropriate leave requesting procedures for January 20, 21, 22, 26, and 27, 2010; (2) being AWOL on those same dates; (3) unauthorized absences on January 14, 15, and 19, 2010 when Plaintiff was scheduled to perform C&P exams; (4) misuse of government equipment and resources based on Plaintiff's placing material

---

[11] Defendant's Exh. 34.
[12] Defendant's Exh. 57.
[13] Defendant's Exh. 37.

on two CDs pertaining to Plaintiff's membership in the Association of Black Cardiovascular and Thoracic Surgeons ("ABCTS"), which membership is separate and apart from Plaintiff's appointment as a physician within the VA's healthcare system; (5) excessive cancelation of C&P exam appointments; and (6) excessive requests not to schedule C&P exams, including for 16 of the 35 dates Plaintiff was to have been available to perform the exams, which requests not to schedule were honored, only to have Plaintiff cancel his authorized leave on eight of the 16 days and report to work, albeit not in Comp and Pen but in Patient Safety. Proposed Termination Letter at Bates 924-926; Dkt. 90 at 68. The Proposed Termination Letter references Plaintiff's July 7, 2009 admonishment for failure to follow a direct order in connection with the investigation into the three mortality cases undertaken as a result of Plaintiff's June 4, 2009 Letter to Feeley. Proposed Termination Letter at Bates 927. Plaintiff maintains he was provided with the Proposed Termination Letter as he was about to travel to New York City to accompany his then-wife, Dr. Cole-Hoover, to surgery for removal of a brain tumor. Dkt. 90 at 69-70. Dr. Rainstein testified that he was unaware of Dr. Cole-Hoover's medical condition, Dkt. 92 at 110-11, and Plaintiff conceded he does not recall what information he shared with Dr. Rainstein regarding Dr. Cole-Hoover's condition. Dkt. 90 at 70-71. Plaintiff, through his attorney, Mr. Pendergrass, opposed the proposed termination. Dkt. 90 at 76; Dkt. 92 at 109-10. The March 4, 2010 ORM Notice advised Director Feeley that Plaintiff had contacted ORM on January 29, 2010, and had since raised concerns regarding the reassignment on December 24, 2009 from ACOS for Patient Safety to performing C&P exams, as well as the February 4, 2010

Proposed Termination Letter proposing Plaintiff's discharge from his VA employment. March 4, 2010 ORM Notice at 337.

On May 5, 2010,[14] a nurse working in the area of Plaintiff's Patient Safety office, reported to Varkonda Plaintiff's snoring suddenly stopped, causing Varkonda to enter Plaintiff's office where she observed Plaintiff under the desk in a fetal position with his back toward the desk's kneehole. Dkt. 93 at 43, 45. Unable to detect Plaintiff's pulse, Varkonda instructed her staff to call a code 10, indicating an emergency overhead announcement was needed to call a resuscitation team. *Id.* While awaiting the resuscitation team, Varkonda and another nurse managed to turn Plaintiff around while Varkonda continued attempting to obtain a pulse, stepping aside once the resuscitation team arrived. *Id.* at 43-44. The resuscitation team pulled Plaintiff from underneath the desk, put Plaintiff on a gurney with a ventilation face mask and took Plaintiff to the emergency room. *Id.* Varkonda did not know whether Plaintiff was admitted to the hospital with respect to the incident, although Plaintiff did not return to work for several days. *Id.* at 45. Plaintiff neither recalls the incident nor disputes it occurred. *Id.* at 184-86. Varkonda reported the incident to then VA Director Michael Finnegan ("Finnegan"),[15] and complained to Dr. Rainstein about Plaintiff's behavior, especially that Plaintiff's snoring was so loud as to be disruptive, and Varkonda's staff considered Plaintiff's poor work ethic to be both demoralizing and humiliating. Dkt. 91 at 36; Dkt. 93

---

[14] Although Varkonda testified this incident occurred on May 5, 2010, Dkt. 93 at 45, Varkonda also expressed some uncertainty about the precise date, see Dkt. 93 at 97-101 (Varkonda testifying she was only certain the incident occurred prior to Plaintiff being granted privileges for internal medicine on May 6, 2010, and that following the incident, Plaintiff no longer had a position in Performance Management), and the context of Varkonda's ensuing testimony indicates the incident may have occurred on May 5, 2009. *See* Dkt. 93 at 44-45 (Varkonda testifying that after this incident, Plaintiff was transferred to the C&P Department). The date discrepancy, however, is irrelevant to the merits of Plaintiff's claims.
[15] According to Varkonda, Finnegan was serving as interim director while Director Feeley was assigned to VISN in Albany. Dkt. 93 at 102-03.

at 44-46. Dr. Rainstein told Varkonda that Plaintiff's work location was going to be moved to the C&P office where Plaintiff would be working. Dkt. 93 at 45.

Upon review by Director Feeley, on June 18, 2010, Plaintiff's proposed termination was reduced to a 30-day suspension without pay from June 25 through July 24, 2010. Defendant's Exhs. 39-40; Dkt. 90 at 76; Dkt. 92 at 114. After serving the 30-day suspension, Plaintiff grieved the suspension. *See* Defendant's Exh. 43 at 1-2 (settlement agreement referencing Plaintiff's agreement to withdraw grievance filed regarding the 30-day suspension); Dkt. 90 at 76.

In August 2010, Plaintiff, who suffered from kidney disease and failure, took a medical leave to undergo a kidney transplant. Dkt. 89 at 125-26. Upon returning to work at the Buffalo VA in mid to late September, Plaintiff found his entire office had been packed up and put on pallets on the loading docks. *Id.* at 126-27. Plaintiff retrieved his personal items and office materials himself, and did not again have an office at Buffalo VA, but sat in the Buffalo VA library. *Id.* at 128. Plaintiff does not recall whether he performed C&P exams after returning to work following his kidney transplant. *Id.* at 128.

Following a grievance hearing in September 2010, the VA and Plaintiff agreed to resolve the grievance, and such agreement included that Plaintiff would retire effective October 14, 2010. Defendant's Exh. 43; Dkt. 90 at 76. On October 14, 2010, Plaintiff and the VA reached a settlement regarding Plaintiff's 30-day suspension previously imposed with regard to the January AWOL incident. Full and Final Settlement Agreement ("Settlement Agreement").[16] The Settlement Agreement provides that the

---

[16] Defendant's Exh. 43.

30-day suspension would be rescinded with Plaintiff granted the opportunity to retire that same day. Settlement Agreement ¶ I.1. Plaintiff would be granted employee sick leave and/or family care leave for his absences on January 20, 21, 22, 26 and 27, 2010, as well as the period June 25 through July 24, 2010, for which the 30-day suspension was imposed, with Plaintiff receiving pay for all such time, and any sick leave requested through October 13, 2010 was to be granted. *Id.* ¶ I.2. The 30-day disciplinary suspension was to be removed from all record systems upon Plaintiff's retirement. *Id.* ¶ I.3. In return, Plaintiff was to accept the Settlement Agreement and all its terms and provisions in settlement and resolution of the June 18, 2010 Grievance Plaintiff filed with regard to the 30-day suspension. *Id.* ¶ II.1. Plaintiff was to withdraw and dismiss with prejudice the June 18, 2010 Grievance, *id.* ¶ II.2, and to complete and sign all paperwork necessary to establish October 14, 2010 as Plaintiff's effective retirement date. *Id.* ¶ II.3. The Settlement is signed by Dr. Rainstein, Plaintiff, and Plaintiff's attorney, Mr. Pendergrass. *Id.* at 3. On October 14, 2010, Plaintiff retired from the VA. Defendant's Exh. 44. Since Plaintiff's retirement, the ACOS for Patient Safety position has never been filled, and Dr. Rainstein maintains that although the Buffalo VA needed a patient safety officer, the position did not require a physician, and the ACOS for Patient Safety position was created solely to allow Plaintiff to maintain employment with the VA after being replaced by Dr. Rainstein as Acting Chief of Surgery in July 2005. Dkt. 92 at 23-24, 126.

Following his retirement from the VA, Plaintiff never again sought employment as a physician. Dkt. 90 at 88. Plaintiff continued to hold a position with the Medical School from which Plaintiff retired in 2013. *Id.* at 89. Since retiring from the Medical School,

Plaintiff has neither sought nor held a paying job. *Id.* Although Plaintiff testified at trial that had he not retired from the VA in 2010, he intended to work until age 70 or 72, Dkt. 89 at 134; Dkt. 90 at 89, in contrast, in his prior deposition testimony Plaintiff stated he planned to work until age 68. Defendant's Exh. 54 at 54 (Plaintiff's deposition testimony that Plaintiff intended to retire between ages 68 and 70 as long as Plaintiff "felt good"); Dkt. 90 at 90.

## CONCLUSIONS OF LAW

**1.     Applicable Law**

Plaintiff brings his employment discrimination claims pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, *et seq.* (retaliation), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* (hostile work environment and constructive discharge). The parties do not dispute the relevant law but, rather, only whether the facts establish Defendant VA violated the relevant law in connection with Plaintiff's employment.

At a bench trial on a civil action, as with any civil case, the burden of proof is on the Plaintiff to prove each element of his claims by a preponderance of the evidence. *Wilson v. Calderon*, 367 F.Supp.3d 192, 195 (S.D.N.Y. 2019) (citing cases). "'The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses.'" *Id.* (quoting *United States v. Gigante*, 94 F.3d 3, 55 (2d Cir. 1996)). With regard to conflicting testimony and disputed issues of fact, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited." *Krist v. Kolombos Rest.,*

*Inc.*, 688 F.3d 89, 95 (2d Cir. 2012). Further, "as trier of fact, the judge is 'entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness.'" *Id.* (quoting *Diesel Props S.R.L. v. Greystone Business Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (internal quotation marks and citation omitted)).

## 2. Title VII Retaliation

Claims for retaliation in violation of Title VII are analyzed according to the burden-shifting framework the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ("*McDonnell Douglas* burden-shifting test"). *See Blanc v. Sagem Morpo, Inc.*, 394 Fed.Appx. 808, 809 (2d Cir. Oct. 1, 2010) (considering Title VII retaliation claim under *McDonnell Douglas* burden-shifting test). In particular, the plaintiff must first establish a *prima facie* case of retaliation, shifting the burden to the defendant to show a legitimate, non-retaliatory reason for the relevant adverse employment action, which then returns the burden to the plaintiff to establish such asserted reason is mere pretext for impermissible retaliation. *Id.* As to Plaintiff's initial burden, to establish a *prima facie* case of Title VII retaliation, "a plaintiff is required to show by a preponderance of the evidence that: (1) the plaintiff participated in a protected activity; (2) the defendant knew of the protected activity; (3) the plaintiff experienced an adverse employment action, as defined by the Supreme Court in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); and (4) a causal connection exists between the protected activity and the adverse employment action." *Id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003)). Upon establishing a *prima facie* case of retaliation, thereby meeting Plaintiff's initial burden, "a presumption of retaliation arises," shifting the onus to Defendant to "articulate a

legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). A *prima facie* case of retaliation, however, only establishes a rebuttable presumption of retaliation. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932 (2d Cir. 2010). Once Defendant has submitted a neutral, *i.e.*, non-retaliatory reason for the alleged adverse action, "the presumption of retaliation dissipates," *Jute*, 420 F.3d at 173, and the burden shifts back to the employee to demonstrate his participation in the protected activity "was a but-for cause of an adverse employment action, by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate nonretaliatory reasons for its action." and the employee must show that retaliation was a substantial reason for the adverse employment action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). In the instant case, the record either fails to establish a *prima facie* case of retaliation under Title VII, or demonstrates Plaintiff has utterly failed to rebut the legitimate, non-retaliatory reasons Defendant proffers for the asserted adverse employment actions.

With regard to the first two elements for a *prima facie* case of retaliation, it is undisputed that Plaintiff's June 4, 2009 Letter to soon-to-be Buffalo VA Director Feeley alleging race discrimination against several African-American physicians at the Buffalo VA, including Plaintiff's then-wife Dr. Cole-Hoover, and Dr. Awolesi, constituted a protected activity under Title VII, and that Defendant Buffalo VA was aware of such activity as established by the fact the June 4, 2009 Letter was directed to Feeley and the claims raised therein were investigated by the Buffalo VA. Further, subsequent to Feeley's receipt of the June 4, 2009 Letter, Plaintiff was subjected to several adverse

employment actions, including the placement in Plaintiff's employment file of a letter of discipline, Plaintiff's assignment to performing C&P exams involving fewer job responsibilities than his ACOS for Patient Safety position, the February 2010 disciplinary action originally proposing Plaintiff's termination, which was subsequently reduced to a 30-day suspension without pay, poor performance reviews resulting in reduced or no bonus pay, and the denial of several of Plaintiff's requests for authorized leave to attend medical conferences, thus satisfying the third element of a *prima facie* case of retaliation. *See Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (considering "significantly diminished material responsibilities" among examples of adverse employment actions under Title VII). Accordingly, the court's consideration is limited to only whether Plaintiff has presented evidence establishing the fourth element requiring a causal connection between Plaintiff's writing the June 4, 2009 Letter complaining of race-based discrimination and any of the adverse employment actions and, where Plaintiff's evidence arguably sustains Plaintiff's burden to establish a *prima facie* case of retaliation, whether Defendant's legitimate, non-retaliatory reason for such adverse employment action is sufficiently rebutted by Plaintiff.

"Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity." *University of Texas Southwest Med. Ctr. v. Nassar*, 571 U.S. 338, 362, 364 (2013). To establish the causation element in the context of retaliation, Plaintiff must show "the retaliation was a 'but-for' cause of the employer's adverse action. . . . 'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.'" *Duplan v. City*

*of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90-91 (2d Cir. 2015)).   Proof of a mere mixed-motive is, however, insufficient to establish causation in a Title VII retaliation case.  *Univ. of Texas Southwest Med. Ctr.*, 571 U.S. at 362, 364 ("a retaliation claim . . . will fail unless the complainant shows 'but-for' causation, *i.e.*, that the employer would not have taken the adverse employment action but for the design to retaliate." (dissent)).  Here, even assuming, *arguendo*, the temporal proximity of Plaintiff's sending the June 4, 2009 Letter and the various adverse employment actions circumstantially establishes the requisite but-for causation for a *prima facie* case of race-based retaliation, the record is devoid of any evidence that Defendant's asserted legitimate, non-retaliatory reasons for the adverse employment actions are mere pretext for retaliation.

In particular, with regard to the July 7, 2009 Letter of Admonishment Director Feeley placed in Plaintiff's personnel file, Defendant's Exh. 20, Plaintiff never disputed the premise for the Letter of Admonishment, specifically, that Plaintiff, after authoring the June 4, 2009 Letter in which, in addition to asserting several other Buffalo VA physicians were being subjected to race-based employment discrimination, also claimed another physician, Dr. Li, committed malpractice that directly caused the death of three Buffalo VA patients, which claims were sufficiently serious that Dr. Rainstein requested Plaintiff's assistance in investigating them, directing Plaintiff provide for each of the deceased in the three mortality cases the last names and last four digits of the social security numbers and any specific concerns regarding the cases.  Dkt. 89 at 177-78.  Despite repeated requests for this information, which should have taken less than one hour to obtain, Dkt. 91 at 61-63, 67-69; Dkt. 92 at 38, Plaintiff inexplicably failed to

provide the information, and thereby also failed to cooperate with the investigation, asserting only that more time was needed to prepare a full investigation despite acknowledging Dr. Rainstein did not request such investigation and that upon Plaintiff's providing the identifying information for the three deceaseds Dr. Rainstein intended to forward the relevant files to an outside investigator. Dkt. 89 at 177-78. Nor did Plaintiff ever request additional time or explain why he was unable to timely provide the identifying information. Dkt. 89 at 178-80. Plaintiff even admitted at trial that prior to sending the June 4, 2009 Letter, Plaintiff did not review any of the three mortality cases and, as such, could not attest to the veracity of the allegations of medical malpractice Plaintiff made against Dr. Li despite being aware of the gravity of such allegations. Dkt. 89 at 171-72, 197. Moreover, upon reviewing the files, Plaintiff concluded no professional malpractice or misconduct occurred, but left it to Dr. Rainstein's discretion whether to follow through with the planned outside investigation into the three mortality cases. Dkt. 89 at 173-76; 197. These circumstances sufficiently establish that Plaintiff engaged in insubordinate conduct by authoring the June 4, 2009 Letter thereby making unsubstantiated and serious allegations of medical malpractice against Dr. Li, which resulted in the commencement of an investigation into the deaths of three Buffalo VA patients, whose deaths had already been investigated, and in which investigation Plaintiff, despite repeated orders from Dr. Rainstein, failed to participate for one month and, upon finally reviewing the medical records pertinent to the three mortality cases, determined there was no need for any further investigation. Accordingly, the circumstantial evidence of causation that Plaintiff's inclusion in the June 4, 2009 Letter of claims of race-based discrimination against several other Buffalo VA physicians was

the reason for the placement in Plaintiff's personnel file of the Letter of Admonishment is limited to temporal proximity.  Although "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, [ ] without more, such temporal proximity is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext."  *El Sayed*, 627 F.3d at 933.  As such, by relying solely on the temporal proximity between Defendant's placing the Letter of Admonishment in Plaintiff's personnel file and the assignment of Plaintiff to performing C&P exams, Plaintiff has utterly failed to rebut the legitimate, non-retaliatory reasons proffered by Defendant for such adverse employment action.  Accordingly, Plaintiff's retaliation Claim is DENIED on this basis.

Shortly after sending the June 4, 2009 Letter, Plaintiff was assigned to perform, on a part-time basis, C&P exams and later assigned full-time to the C&P Department.  Plaintiff maintains this assignment was unsuitable for a physician with Plaintiff's training, expertise, and experience and, as such, could only have been in retaliation for sending the June 4, 2009 Letter.  Although diminishing an employee's job responsibilities may establish an adverse employment action, *see Joseph*, 465 F.3d at 90 (considering diminished job responsibilities as an example of a materially adverse employment change), in the instant case, a fair consideration of the evidence in the record establishes Defendant had a legitimate, non-retaliatory reason for assigning Plaintiff to performing C&P exams, which Plaintiff has failed to rebut.  Specifically, Plaintiff was assigned to perform C&P exams because of the Buffalo VA's dire need for help with the back-log of C&P exams, the performance rate for which Buffalo VA lagged behind most of the country, as well as Plaintiff's lack of productivity in his ACOS for Patient Surgery

position.  In particular, the record establishes that despite being assigned to work from 8:00 A.M. to 4:00 P.M., Monday through Friday, Plaintiff routinely arrived after 10:00 A.M. and left before 2:00 P.M.  Upon arriving at work, Plaintiff spend significant time reading periodicals and napping in his chair, even occasionally crawling underneath his desk to sleep.  Plaintiff missed numerous appointments and participated in only 8 of 63 root cause analyses despite leading such investigations being a stated requirement of Plaintiff's ACOS for Patient Safety position.  At trial Plaintiff produced no written work product to support Plaintiff's asserted work performance while ACOS for Patient Safety.  Accordingly, Plaintiff has failed to rebut Defendant's legitimate, non-discriminatory reason for assigning Plaintiff to perform C&P exams and, as such, Plaintiff's claim that such assignment was predicated on Plaintiff's sending the June 4, 2009 Letter fails.

Nor does anything support Plaintiff's argument that the February 2010 disciplinary action originally proposing Plaintiff's termination and which was subsequently reduced to a 30-day suspension without pay, was in retaliation for sending the June 4, 2009 Letter; rather, a fair consideration of the record establishes such disciplinary measure was taken only in response to Plaintiff being AWOL for five days in January 2010.  Not only is the disciplinary action not sufficiently close in temporal proximity to Plaintiff's sending of the June 4, 2009 Letter, *see Clark Cnty. Sch. Dist. v. Breeden*, 52 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." (internal quotation marks and citations omitted)); *Brown v. Xerox Corp.*, 170 F.Supp.3d 518, 529-30 (W.D.N.Y. 2016) (adverse

employment actions occurring between nine and 18 months after protected activity too remote to establish causation for retaliation claim), but Plaintiff has failed to rebut Defendant's legitimate, non-retaliatory reasons for the disciplinary measure. In that regard, Plaintiff does not dispute that Dr. Rainstein provided Plaintiff with the opportunity to submit documentation establishing Plaintiff was absent those days because he was dealing with medical issues pertaining either to himself or to his now former wife, but that Plaintiff failed to avail himself of that opportunity. Moreover, Plaintiff's termination was later reduced to a thirty-day suspension without pay. Accordingly, not only has Plaintiff failed to establish a *prima facie* case for retaliation by failing to show that but for sending the June 4, 2009 Letter, he would not have been subjected to the disciplinary action pertaining to his January 2010 AWOL, Plaintiff has also utterly failed to establish Defendant's legitimate, non-retaliatory reason for the disciplinary action was mere pretext for retaliation.

Insofar as Plaintiff claims he was given poor performance reviews resulting in reduced or no bonus pay in retaliation for the June 4, 2009 Letter, the record establishes that bonus or market pay is available only for physicians working in high-demand specialties, which do not include Patient Safety. In fact, in January 2008, 18 months prior to sending the June 4, 2009 Letter, Plaintiff was denied market pay because Patient Safety was not considered a high demand area of speciality. Further, in December 2008, after meeting only 1 ½ of five performance goals, Plaintiff's performance pay was limited to $ 750 of a possible $ 5,750. That Plaintiff's performance evaluations and market pay were declining well before Plaintiff sent the June 4, 2009 Letter fails to establish that the decreased performance pay and

performance evaluations would not have occurred "but for" the June 4, 2009 Letter such that Plaintiff has not established a *prima facie* case of retaliation based on poor performance reviews.

Finally, with regard to Plaintiff's assertion that he was denied authorized absences to attend various medical conferences in retaliation for sending the June 4, 2009 Letter, the proof at trial firmly establishes that Plaintiff had requests for authorized absences both approved and denied prior to and after the June 4, 2009 Letter, thereby rendering without merit any assertion of but-for causality on this point. Nor did Plaintiff challenge Dr. Rainstein's legitimate and non-retaliatory explanation that authorized absences are to be approved only when the purpose of the request is deemed likely to promote the provision of patient care at the Buffalo VA.

Plaintiff thus either has failed to establish the adverse employment actions are attributable to Plaintiff's sending of the June 4, 2009 Letter as required for the fourth element for a *prima facie* case of retaliation, or has failed to rebut Defendant's legitimate, non-retaliatory reasons for taking the various adverse employment actions. Accordingly, Plaintiff's Title VII retaliation claim is DISMISSED.

### 3.     ADEA Hostile Work Environment and Constructive Discharge

The ADEA protects individuals ages 40 and over from age-based employment discrimination. 29 U.S.C. § 631(a). The criteria under which claims for hostile work environment and constructive discharge are analyzed are significantly different than those relevant to the *McDonnell Douglas* burden-shifting analysis employed in considering a retaliation claim. *See Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (recognizing distinction between McDonnell Douglas burden-shifting framework

and hostile work environment analysis). In particular, to establish a hostile work environment claim, the plaintiff "must produce enough evidence to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (analyzing hostile work environment claim under Title VII based on race[17]) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)). The plaintiff must establish not only that he "subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Id.* (citing *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003)). "Generally, unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). As such, the court must "look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Gorzynski*, 596 F.3d at 102 (citing cases and quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Also to be considered is the extent to which the conduct occurred because of the plaintiff's membership in a protected class, here, age. *See Kassner v. 2nd Avenue Delicatessen, Inc.*, 496 F.3d 229, 241 (2d Cir. 2007) (to establish a hostile work environment under the ADEA, the plaintiff must prove he was

---

[17] "The analysis of the hostile working environment theory of discrimination is the same under the ADEA as it is under Title VII." *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

subjected to the hostility because of his membership in a protected class including, under the ADEA, age (citing *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)).

In the instant case, other than the undisputed fact that Plaintiff, at all times relevant to this action, was of sufficient years in age to merit protection under the ADEA, the record is completely devoid of any evidence, direct or circumstantial, that even hints that Plaintiff was subjected to any age-based discriminatory harassment or conduct. At trial, Plaintiff admitted that neither Director Feeley nor Dr. Rainstein, both of whom are close to Plaintiff in age, made any age-related derogatory comments toward Plaintiff or even any comments referencing Plaintiff's age. Dkt. 90 at 84-85. Plaintiff also admitted that during the relevant time period, *i.e.*, 2009-2010, there were "many other doctors who worked at the VA who were in their 60s." *Id.* at 85. Nor does a fair and careful review of the disciplinary measures to which Plaintiff maintains he was wrongly subjected even remotely suggest such measures are attributable to Plaintiff's age; rather, the evidence strongly supports such discipline resulted from Plaintiff's unjustified violations of VA work rules and repeated flouting of Dr. Rainstein's direct orders. Specifically, insofar as Plaintiff's asserts he was subjected to adverse employment actions based on his age, including the Letter of Admonishment, the assignment to perform C&P exams and eventual transfer to the C&P Department, the February 2010 disciplinary action for the January 2010 AWOL that proposed terminating Plaintiff's employment and which was later reduced to 30-day suspension without pay, and diminished performance review resulting in denial of bonus pay, the record establishes only that such measures were taken for legitimate reasons. *See* Discussion, *supra*, at

29-34.  Plaintiff thus has failed to establish his hostile work environment claim under the ADEA and, accordingly, the claim is DISMISSED.

With regard to Plaintiff's age-based constructive discharge claim, "[w]here an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff 'must show working conditions so intolerable that a reasonable person would have felt compelled to resign.'" *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 139 (2004)); *see also Green v. Brennan,* __ U.S. __; 136 S.Ct. 1769, 1777 (2016) ("A claim of constructive discharge ... has two basic elements. A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign. [And] he must also show that he actually resigned." (internal citation omitted)).  "This standard is higher than the standard for establishing a hostile work environment." *Fincher*, 604 F.3d at 725 (citing *Suders*, 542 U.S. at 147).  In the instant case, because Plaintiff failed to establish an age-based hostile work environment claim, it logically follows that his age-based constructive discharge claim also fails.  *See Fincher*, 604 F.3d at 725 (affirming district court's dismissal of plaintiff's discharge claim as a matter of law where her hostile work environment claim also failed as a matter of law).

Accordingly, Plaintiff has failed to establish he was subject to a hostile work environment or constructive discharge in violation of the ADEA, requiring such claims be DISMISSED.

## **CONCLUSION**

Based on the foregoing, Plaintiff has failed to establish any cause of action against Defendant VA, and the Complaint is DISMISSED with prejudice; the Clerk of Court shall enter judgment accordingly and close the file.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      January 9, 2020
            Buffalo, New York